UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK ALLCHIN and DAVID FOSTER, individuals, on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>    v.<br><br>VOLUME SERVICES, INC. dba, CENTERPLATE; and DOES 1–100, inclusive,<br><br>           Defendants. | No.  2:15-cv-00886-TLN-EFB<br><br><br>**ORDER** |

This matter, a putative class action involving allegations of California wage and hour violations, is before the Court pursuant to a Motion to Remand brought by Plaintiffs Mark Allchin and David Foster ("Plaintiffs") and a Motion to Transfer Venue brought by Defendant Volume Services, Inc., doing business as Centerplate (hereinafter "Defendant" or "Centerplate"). For the reasons stated below, Plaintiffs' Motion to Remand is DENIED and Defendant's Motion to Transfer is GRANTED.[1]

**I. Procedural History**

On March 16, 2015, Plaintiffs filed the initial Complaint in the Superior Court of

---

[1]  In light of transfer, the Court does not rule on Defendant's pending Motion to Dismiss and/or to Strike (ECF No. 11).

1  California, County of Sacramento.  (ECF No. 1-3.)  The matter was removed and filed in this

2  Court on April 24, 2015.  (ECF No. 1.)  On May 1, 2015, Defendant filed a Motion to Dismiss

3  and/or Strike portions of the Complaint.  (ECF Nos. 4, 8.)  On May 21, 2015, Defendants filed a

4  Motion to Transfer this matter to the Southern District of California.  (ECF No. 6.)  On May 22,

5  2015, Plaintiffs filed a First Amended Complaint ("FAC").  (ECF No. 7.)  On May 26, 2015,

6  Plaintiffs filed a Motion to Remand.  (ECF No. 9.)  On June 4, 2015, Defendant filed a Motion to

7  Dismiss the FAC.  (ECF No. 11.)  The parties have filed Oppositions and Replies relative to each

8  of the aforementioned motions.  (ECF Nos. 12–14, 16–18.)

9      **II. Background**

10      The parties dispute whether the allegations in the Complaint versus the FAC are relevant

11  for determining whether this case must be remanded.  The FAC makes additional allegations and

12  clarifies the damages sought.  The FAC also adds an additional cause of action under the Private

13  Attorney General Act of 2004 ("PAGA").  First the Court will set forth the main allegations in the

14  Complaint, and then the Court will set forth the additional allegations from the FAC.

15      A. Allegations in the Complaint

16      The Complaint brings five causes of action: 1) failure to pay overtime wages; 2) failure to

17  pay all wages due for each pay period; 3) failure to pay all wages upon termination or resignation;

18  4) failure to provide accurate wage statements; and 5) unfair competition under Cal. Bus. & Prof.

19  Code § 17200.

20      As alleged in the Complaint, Plaintiffs were employees of Defendant, working as

21  food/banquet servers.  (Compl. ¶¶ 8–9.)  Plaintiffs and other employees of Defendants were not

22  properly paid overtime wages for all hours worked.  (Compl. ¶¶ 16–18.)  Defendants have not

23  provided itemized wage statements accurately reporting all applicable hourly rates or the correct

24  amount of overtime wages earned. (Compl. ¶ 19.)

25      Relative to Claim 1, Plaintiffs cite California Labor Code § 510, which provided during

26  the relevant time period: "(a) Eight hours of labor constitutes a day's work.  Any work in excess

27  of eight hours in one workday and any work in excess of forty hours in any one work week …

28  shall be compensated at the rate of no less than one and one-half times the regular rate of pay for

2

an employee." (Compl. ¶ 25.) Plaintiffs state that they and the purported class worked for Defendant "during shifts that consisted of more than eight hours in a work day and/or more than forty hours in a work week without Defendants properly paying required overtime wages." (Compl. ¶ 27.)

Relative to Claim 2, Plaintiffs allege that they "were not paid for all overtime wages earned during each pay period." (Compl. ¶ 33.) *See* Cal. Lab. Code § 204 ("All wages [other than those not pleaded here] earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays").

Relative to Claim 3, Plaintiffs allege that Defendants "had a practice of not paying, upon termination or resignation, the proper amount of unpaid overtime wages as a consequence of the practice of Defendants' failure to properly calculate the amount of overtime compensation due and owing." *See* Cal. Lab. Code §§ 201 and 202. Plaintiffs seek damages under numerous California Labor Code provisions, including section 203, which provides that upon termination or resignation of the employee, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Lab. Code § 203. (Compl. ¶ 38.)

Relative to Claim 4, Plaintiffs cite Labor Code § 226(a) for the proposition that they were entitled to receive, semi-monthly or at the time of each payment of wages, an accurate itemized statement showing gross wages earned, net wages earned, all applicable hourly rates in effect during the pay period and the corresponding number of hours worked by the employee at each hourly rate. (Compl. ¶ 47.) Plaintiffs further cite Labor Code § 226(e) for the proposition that they are entitled to recover $50 for the initial pay period in which a violation of § 226(a) occurred, and $100 for each violation of § 226(a) in a subsequent pay period, not to exceed an aggregate penalty of $4,000 per employee. (Compl. ¶ 52.)

Relative to Claim 5, Plaintiffs seek damages under Cal. Bus. & Prof. Code § 17200 (prohibiting any "unlawful, unfair or fraudulent business act or practice").

//

3

B. <u>Allegations in the First Amended Complaint</u>

Plaintiffs provide further details in the FAC.  The FAC includes the same five causes of action as in the Complaint, and an additional cause of action under the Private Attorney General Act of 2004 ("PAGA"), Cal. Labor Code § 2698 *et seq*.

Plaintiffs allege that Defendants provide food, catering and banquet services for a host of various events and in different venues throughout California, including in Sacramento County. When Defendants received payments for such services from their customers and/or clients, they routinely charged and/or collected a "mandatory service charge" from their customer and/or client, which was based on a percentage of the customer's total bill.  This service charge "is apparently not negotiable and is not subject to the customer's discretion, unlike a tip or gratuity." (FAC ¶ 17.)

Plaintiffs allege: "In addition to the hourly base wage, Defendants paid Plaintiffs and others similarly situated, among other things, a portion of the service charges which Defendants had collected throughout the subject pay period.  These service charge payments to employees averaged hundreds of dollars each pay period … [¶] … The service charge payment amounts paid by Defendants to Plaintiff and others similarly situated were[] thus part of such employee's regular rate of pay for purposes of calculating overtime."  (FAC ¶¶ 19, 20.)

Plaintiffs allege: "Notwithstanding, when Plaintiffs and others similarly situated worked overtime hours (i.e. in excess of 8 hours a day or 40 hours in a week), Defendants compensated Plaintiffs and other similarly situated employees at a rate that was equal to only one and one-half times their *base hourly rate*, without regard to service charge payments received or any other compensation that should have been lawfully figured into the employees' 'regular rate of pay' for overtime calculation purposes."  (FAC ¶ 22.)

Plaintiffs allege: "In addition, Plaintiffs and others similarly situated would periodically work multiple shifts in the same day at the same event or venue, which shifts might be at different positions and/or compensated at different base hourly rates.  Nonetheless, when such shifts totaled more than 8 hours in a single day, Defendants often failed to pay Plaintiffs and other similarly situated any overtime at all, let alone properly including any service charge

4

compensation in their calculation of overtime rates."  (FAC ¶ 23.)

Plaintiffs allege: "Accordingly, Plaintiffs[] and others were effectively deprived of their proper payment of wages for any and all pay periods in which they earned overtime wages." (FAC ¶ 25.)

Plaintiffs allege: "…Defendants generally discouraged employees through written and/or unwritten policies, from working overtime hours … Plaintiffs presently believe based on current information available to them that the average putative class member is/was owed additional overtime payments during the class period of approximately $100 each."  (FAC ¶ 26.)

Regarding Labor Code § 226(e) penalties, Plaintiffs allege:  "such violations would only have occurred in pay periods during which putative class members worked overtime hours and Plaintiffs are informed and believe based on current information available to them that the average putative class member worked in approximately 10 pay periods during the class period." (FAC ¶ 62.)

C.  <u>Class allegations</u>

Both the Complaint and the FAC seek to define similar classes and subclasses, with the FAC containing an additional phrase regarding "service charge distributions".  The FAC states the following definitions:

- The Class:  All current and former non-exempt employees of Defendants within the State of California who, at any time commencing four (4) years preceding the filing of Plaintiffs' Complaint up until the time that notice of the class action is provided to the class, were compensated, at least in part, by service charge distributions and who worked overtime hours; and

- The Subclass:  All former employees of Defendants within the State of California who, at any time commencing four (4) years preceding the filing of Plaintiffs' complaint and up until the time that notice of the class action is provided to the Class, were compensated, at least in part, by service charge distributions and worked overtime but did not receive all their full overtime wages upon termination or resignation of their employment.

5

1  (FAC ¶ 30; Compl. ¶ 20)

2      **III. Removal and Remand**

3          A.  Legal Standard: Removal and CAFA

4          In this case, the Complaint filed in state court was removed.  Following removal, Plaintiffs

5  filed the FAC in this Court.  Following the filing of the FAC, Plaintiffs filed the instant Motion to

6  Remand.

7          "[A]ny civil action brought in a State court of which the district courts of the United

8  States have original jurisdiction, may be removed by the defendant or the defendants, to the

9  district court of the United States for the district and division embracing the place where such

10  action is pending."  28 U.S.C. § 1441(a).  However, "[i]f at any time before final judgment it

11  appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28

12  U.S.C. § 1447(c).

13          Relevant to this action, CAFA gives federal district courts jurisdiction where: (1) the

14  matter in controversy exceeds the sum or value of $5,000,000; (2) the number of members of all

15  proposed plaintiff classes in the aggregate is 100 or greater; and (3) there is minimal diversity

16  between the defendants and plaintiffs.  28 U.S.C. § 1332(d).

17          "[N]o antiremoval presumption attends cases invoking CAFA, a statute Congress enacted

18  to facilitate adjudication of certain class actions in federal court."  *Dart Cherokee Basin*

19  *Operating Co., LLC v. Owens*, 135 S. Ct. 547, 550 (2014).  "A defendant's notice of removal

20  need include only a plausible allegation that the amount in controversy exceeds the jurisdictional

21  threshold," and does not need to contain evidentiary submissions.  *Id.* 554.  However, when the

22  controversy is contested by plaintiffs, evidence establishing the amount is required, and the court

23  must decide where the preponderance lies.  *Id.*  "CAFA's requirements are to be tested by

24  consideration of real evidence and the reality of what is at stake in the litigation, using reasonable

25  assumptions underlying the defendant's theory of damages exposure."  *Ibarra v. Manheim*

26  *Investments, Inc.*, 775 F.3d 1193, 1198 (9th Cir. 2015).

27          It appears Plaintiffs do not dispute that the class size is at least 100 members, although

28  Plaintiffs dispute the class size estimated by Defendants in their removal notice.  Plaintiffs also do

6

1    not dispute that diversity of citizenship is present under 28 U.S.C. § 1332(d)(2).  Defendants state

2    that at all relevant times Centerplate was incorporated in Delaware and has its corporate

3    headquarters in Connecticut.  (Rem. Not. ¶ 15.)  Defendants state that greater than two-thirds of

4    putative class members were residents of California during the relevant time period, and were not

5    citizens of Delaware or Connecticut.[2]  (Rem. Not. ¶ 16.)  The named Plaintiffs are California

6    residents.  (FAC ¶¶ 8, 9.)  Plaintiffs do not take issue with this statement of the facts.

         Therefore, the only issue is whether the amount in controversy requirement under CAFA

8    can be met.  On this issue, the parties dispute whether the allegations in the Complaint must be

9    considered, as opposed to the allegations in the FAC.  The parties also dispute whether each

10   other's calculations of the amount in controversy, in their respective briefs, are too speculative.

11       B.  Defendant's Removal Notice

12       Defendant's only submitted evidence in support of removal is the declaration of David

13   Winarski, Vice President of Human Resources at Centerplate.  (ECF No. 1-1.)  That declaration

14   states:

15   • Centerplate has employed approximately 6,458 employees (the putative class) that

16       worked overtime in California from March 16, 2011 [time of filing of the Complaint]

17       to present, including approximately 3,779 currently employed individuals and 2,679

18       former employees.

19   • The average rate of pay for these approximately 6,458 employees was approximately

20       $13.86.

21   • Centerplate has a payroll cycle by which it pays its employees, including all members

22       of the alleged putative class, on a biweekly basis.

23   • On average, the 6,458 employees in the putative class worked approximately 94.6

24       weeks from March 16, 2011 to the present.

25   • From 1-year prior to the filing of the Complaint (March 16, 2014) to present,

26

27   _____
     [2] *See* 28 U.S.C. § 1332(d)(3):  "A district court may, in the interests of justice and looking at the totality of the
     circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third
     but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants
28   are citizens of the State in which the action was originally filed…."

Centerplate has employed approximately 5,252 employees that worked overtime for an average of approximately 41 weeks.

(Winarski Decl. ¶¶ 5–9.)  Defendants therefore reason, in their Notice of Removal, as follows.

*i.  Overtime payments*

The Complaint does not specify how many overtime hours were worked, although the Civil Case Cover Sheet states Plaintiffs are seeking an award of damages in excess of $25,000. However, if each putative class member worked only one (1) hour of overtime per week for which that individual was not paid, the amount in controversy on this one aspect of Plaintiffs' claim would be at least $12,013,875.52.  That calculation is as follows:  1 hour/week x $13.11/hour[3] x 1.5 (overtime premium) x 94.6 weeks x 6,458 employees.  (Rem. Not. ¶ 25.)

*ii.  Wage statements*

Plaintiffs also seek Labor Code § 226(e) penalties for improper wage statements received by potential class members.  Section 226(e) provides for a $50 penalty for the first violative wage statement, and $100 for each subsequent violation during the one-year statute of limitations,[4] with the penalty capped at $4,000 per aggrieved employee.  Since, on average, the 5,252 employees employed during the 1-year period worked for approximately 21 pay periods (41 weeks), these penalties amount to approximately $10,766,600.[5]  This calculation is as follows: ($50 for each first violation + ($100 x 20 pay periods for subsequent violations)) x 5,252 employees that worked during the 1-year period prior to the filing of the Complaint.  (Rem. Not. ¶ 26.)

*iii.  Waiting time penalties*

Relative to penalties for each former employee Plaintiff is seeking under Labor Code § 203, Defendants reason as follows.  Assuming, conservatively, that each former employee worked five hour shifts, earning $13.11 per hour, each day of work would amount to $65.55 of

---

[3] It is not clear why Defendant uses $13.11/hour rather than the average rate of $13.86 stated in Mr. Winarski's declaration.

[4] *See* Cal. Code Civ. Proc. § 340(a) (action shall be commenced "[w]ithin one year [if it is] [a]n action upon a statute for a penalty or forfeiture, if the action is given to an individual, or to an individual and the state, except if the statute imposing it prescribes a different limitation").

[5] Stated as $10,766,000 in the Removal Notice.  (Rem. Not. ¶ 26.)

8

1    pay.  Multiplying this by 30 days, per § 203, each former employee would be entitled to

2    approximately $1,966.50.  As there are approximately 2,679 "former employees" in the class, this

3    claim would amount to approximately $ 5,268,253.50.  This calculation is as follows:  2,679

4    employees x $65.55 x 30. (Rem. Not. ¶ 28.)

5            In their removal notice, Defendants therefore submit that, based on the foregoing

6    calculations – taking into consideration overtime wages due, § 226 penalties, and § 203 penalties,

7    the amount in controversy would be several times greater than the $5 million CAFA requirement.

8    Defendants also point out that Plaintiffs seek restitution under Cal. Bus. & Prof. Code § 17200,

9    and that the amount in controversy may also include attorney's fees.  *See Guglielmino v. McKee*

10   *Foods Corp.*, 506 F.3d 696, 700 (9th Cir. 2007); *Sanchez v. Wal–Mart Stores, Inc.*, 2007 WL

11   1345706, at *2 (E.D. Cal. May 8, 2007).  Therefore, the amount in controversy potentially

12   includes additional sums.  (Rem. Not. ¶ 28–30.)

13           C.  Plaintiffs' Motion to Remand

14           Plaintiffs' foremost argument is that the allegations in the FAC, due to the various ways

15   that the claims are narrowed, establish an amount at $5 million or below.

16           *i.  Overtime payments*

17           Plaintiff state that both the PAGA letter served on Defendant on March 30, 2015, and the

18   FAC, make clear the class is limited to employees who "were compensated, at least in part, by

19   service charge distributions and who worked overtime hours."  (FAC ¶ 30; Mot. Rem., Ex.'s 1

20   and 2.)  Plaintiffs object that the employees described in Mr. Winarski's declaration are simply

21   every employee who worked overtime, not those who were compensated at least in part by

22   service charge distributions.

23           Plaintiffs point out that Defendant's calculations assume employees were not paid

24   anything for overtime hours worked, rather than the difference between overtime paid to class

25   members and the amount of overtime which should have been paid if Defendant had properly

26   calculated the regular rate of pay including service charge payments.  Thus, the calculation should

27   include a factor of .5, rather than a factor of 1.5.

28           Plaintiffs also highlight that the FAC states specifically: "based on the number of

9

1    Plaintiffs' overtime hours during the class period and those of other putative class members of

2    which Plaintiffs are aware, Plaintiffs presently believe based on current information available to

3    them that the average putative class member is/was owed additional overtime payments during

4    the class period of approximately $100 each."  (FAC ¶ 26.)

5          The FAC also states specifically:  "Of course, such [Labor Code § 226] violations would

6    only have occurred in pay periods during which putative class members worked overtime hours

7    and Plaintiffs are informed and believe based on current information available to them that the

8    average putative class member worked overtime in approximately 10 pay periods during the class

9    period."

10         Relative to the allegation that additional overtime payments of approximately $100 is/was

11   owing, Plaintiff argues even if 6,458 were accepted for the number of employees, the total

12   amount of additional overtime owed would be $645,800.  That calculation would simply be 6,458

13   x $100.  (Mot. Rem. at 9.)

14         *ii.  Wage statements*

15         Regarding defective wage statements under Labor Code § 226(e), Plaintiffs argue that

16   Centerplate's calculations are defective because Centerplate has not established as a matter of fact

17   or law it had been put on notice of violations such that the higher pay rates would apply in any

18   pay periods.  *See Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1209 (2008).

19         Plaintiffs also argue that Defendants assume wrongly that every statement issued to every

20   class member was inaccurate and thus subject to penalties.  Rather the FAC alleges: "such

21   violations would only have occurred in pay periods during which putative class members worked

22   overtime hours and Plaintiffs are informed and believe based on current information available to

23   them that the average putative class member worked overtime in approximately 10 pay periods

24   during the class period."  (FAC ¶ 62.)

25         Thus, assuming arguendo a class size of 5,252 individuals, the total amount of penalties

26   for inaccurate wage statements would be in the approximate amount of $2.6 million.  This

27   calculation is as follows: 10 pay periods x $50 x 5,252 employees.  (Mot. Rem. at 9.)

28   //

10

1        *iii. Waiting time penalties*

2        Labor Code § 203 provides that for discharged employees, "the wages of the employee

3   shall continue as a penalty from the due date thereof at the same rate until paid or until an action

4   therefore is commenced; but the wages shall not continue for more than 30 days."

5        Defendants assumed that each of the 2,679 former employees could be included in the

6   calculation, which Plaintiffs object to because each of those employees did not necessarily

7   receive "service charge payments" as part of their compensation.  Plaintiffs object to the

8   Defendant's calculation using four years prior to the filing of the Complaint, while the applicable

9   statute of limitations for § 203 penalties is three years.  *See Pineda v. Bank of America*, 50 Cal.

10  4th 1389 (2010).  Plaintiffs also object that it is unreasonable to assume that for all such former

11  employees, wages were not paid within 30 days.

12       For the aforementioned reasons, although Plaintiffs do not give an express amount, they

13  argue that "Centerplate's purported evidence falls well short of establishing that the amount in

14  controversy exceeds $5 million."  (Mot. Rem. at 12.)[6]

15       D.  Defendant's Opposition and Plaintiffs' Reply

16       Defendant's Opposition and Plaintiffs' Reply offer a fresh batch of calculations.  The only

17  new evidence submitted by either side is Mr. Winarski's Supplemental Declaration, filed by

18  Defendants, which states:

19   •   Centerplate has employed approximately 2,140 employees that worked overtime and

20       received service charges as part of their pay in California, from March 16, 2011 to

21       April 24, 2015 (the date of removal) including approximately 1,564 currently

22       employed individuals and 576 former employees.

23   •   The average rate of pay for these approximately 2,140 employees was approximately

24       $13.51, and they were employed on average for 115.3 weeks from March 16, 2011 to

25       April 24, 2015.

26   •   From one year prior to the filing of the initial Complaint, March 16, 2014, to April 24,

27

28  ───────────────
[6] Plaintiffs also argue that PAGA penalties should either not be included or only 25% should, and that attorney's fees would be minimal.  (Mot. Rem. at 11–12.)

2015, the date of removal, Centerplate employed approximately 1,886 employees that worked overtime and received service charges as part of their pay.  These 1,866 employees worked, on average, during 23 pay periods during the period between March 16, 2014 and April 24, 2015.  (Winarski Decl. ¶¶2–4.)

Accordingly, Defendants redo their equations to be consistent with these numbers, and with the allegations that service charge distributions must be included in calculating the overtime rate of pay.  For example, taking Plaintiffs' § 226(a) and (e) claim, Defendant calculates: ($50 x 1,866 for the first violation for every class member) + ($100 x 22 additional violations x 1,866 class members) = $4,198,500.[7]  Taking Plaintiffs' § 203 claim – assuming a hypothetical in which each former employee worked 8 hour shifts earning $13.51 per hour, then each day of work would amount to $108.08.  Multiplied by 30 days under § 203, and by 576 former employees, the amount would be $1,867,622.40.  (Def.'s Opp.'n at 11–12.)  Adding these two categories of damages together, Defendant puts the amount above the $5 million threshold.  This excludes all other damages and fees sought in the FAC, including overtime wages due, attorney's fees,[8] and PAGA penalties.[9]

Plaintiffs again object that the evidence submitted by Defendant is inconsistent with the FAC's allegations, including allegations that only employees whose rate of pay included service charges and worked overtime are at issue, the allegation that the average class member is owed overtime of approximately $100, and the allegation that the average class member worked overtime in approximately 10 pay periods during the class period.  Plaintiffs object that PAGA penalties would be either nonexistent or that only 25% should be included, and that attorney's

---

[7] The Court assumes this is the calculation Defendant intended.

[8] *See e.g. Icard v. Ecolab, Inc.*, 2010 WL 2528968, at *2 (N.D. Cal. June 18, 2010) ("when estimating attorney's fees for the purposes of establishing jurisdiction, the fees that should be considered are those incurred as of the date of removal"); *Conrad Assoc. v. Hartford Acc. & Indem. Co.,* 994 F. Supp. 1196, 1200 (N.D.Cal.1998).

[9] *See Page v. Luxottica Retail N. Am., Inc.*, 2015 WL 966201, at *7 (E.D. Cal. Mar. 4, 2015) ("Consistent with Eastern District precedent, this Court holds that the 75 percent of PAGA penalties paid to the state should not be included in the amount in controversy calculation"); *but see Pagel v. Dairy Farmers of Am., Inc.,*2013 WL 6501707, at *2–3 (C.D. Cal. Dec. 11, 2013) ("the fact that 75% of any PAGA penalties recovered in this action would be paid to the LWDA, not to individual class members, does not remove those sums from the amount in controversy calculation").

1    fees would be relatively minimal.

2         The parties also dispute whether allegations in the FAC may be considered in the motion

3    to remand.  Defendants argue they may not, because jurisdiction must be established at the time

4    of the filing of the notice of removal.  Plaintiffs argue they are not challenging a defect in

5    removal; rather, the FAC contains information relevant to whether subject matter jurisdiction is

6    present, because it clarifies the initial Complaint.

7         E.  Conclusion

8         *Am. Dental Indus., Inc. v. EAX Worldwide, Inc.*, 228 F. Supp. 2d 1155 (D. Or. 2002), cited

9    by Defendant, contains a relevant analysis.  In *Am. Dental*, plaintiff alleged damages in state court

10   in specific monetary amounts that exceeded the $75,000 threshold.  Defendant removed and

11   plaintiff subsequently filed an amended complaint that alleged specific monetary amounts below

12   the $75,000 threshold.  Plaintiff then moved to remand the matter to state court on those grounds.

13   The *Am. Dental* court reasoned:

14               It has long been the rule that jurisdiction in a diversity case is
                 determined at the time of removal. *St. Paul Mercury Indemnity Co.*
15               *v. Red Cab Co.*, 303 U.S. 283 [] (1938). Plaintiff, nonetheless,
                 contends the Court does not have subject matter jurisdiction in light
16               of the changes in Plaintiff's Amended Complaint, and, therefore,
                 remand is required.  Plaintiff argues a 1988 amendment to 28
17               U.S.C. § 1447(c) renders invalid the analysis applied in *St. Paul*
                 *Mercury* and the cases that followed it.
18
19               Before 1988, 28 U.S.C. § 1447(c) provided:

20                    If at any time before final judgment it appears that the case
                      was removed improvidently and without jurisdiction, the
21                    district court shall remand the case, and may order the
                      payment of just costs.

22               Since the 1988 amendment, the [] statute [has] provided:

23                    If at any time before final judgment it appears that the
                      district court lacks subject matter jurisdiction, the case shall
24                    be remanded.

25               …

26               All circuit courts that have addressed the issue after the 1988
                 amendment have continued to hold that jurisdiction in a diversity
27               case is determined at the time of removal and is not affected by
                 subsequent amendments to the pleadings. *See, e.g., Rogers v. Wal–*
28               *Mart Stores, Inc.,* 230 F.3d 868, 871 (6th Cir. 2000); *Poore v.*

                                            13

1

2

> *American–Amicable Life Ins. Co. of Texas,* 218 F.3d 1287, 1290
> (11th Cir. 2000); *In re Shell Oil Company,* 966 F.2d 1130, 1133
> (7th Cir. 1992).  In other words, if the court has jurisdiction at the
> time of removal, it is unaffected by subsequent acts.

3

4

*Am. Dental*, 228 F. Supp. 2d at 1157 (D. Or. 2002).  *See also Williams v. Costco Wholesale*

5

*Corp.,* 471 F.3d 975, 976 (9th Cir. 2006) ("[P]ost-removal amendments to the pleadings cannot

6

affect whether a case is removable, because the propriety of removal is determined solely on the

7

basis of the pleadings filed in state court").  "It follows that a party that has properly removed a

8

case need not amend its removal notice or file a new notice after an amended complaint changes

9

the ground for federal jurisdiction.  Because post-removal pleadings have no bearing on whether

the removal was proper, there is nothing a defendant can or need do to perfect the removal." *Id.*

10

Plaintiffs direct the Court to *Bankhead v. Am. Suzuki Motor Corp.*, 529 F. Supp. 2d 1329

11

(M.D. Ala. 2008)[10] (citing *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1214 n. 64 (11th Cir.

12

2007)), which held: "In considering these later challenges[11] to jurisdiction, the court may look to

13

any relevant information the parties may present, up until the time of the challenge to

14

jurisdiction."  Plaintiffs argue that this Court can consider any relevant information presented up

15

to the time of the challenge to jurisdiction, including information in their FAC.  The primary

16

allegations Plaintiffs refer to in the Motion to Remand are the FAC's new allegations regarding

17

service charge distributions, and specifically that:  "Plaintiffs presently believe based on current

18

information available to them that the average putative class member is/was owed additional

19

overtime payments during the class period of approximately $100 each" and "the average putative

20

class member worked overtime in approximately 10 pay periods during the class period."  (FAC

21

¶¶ 26, 62.)  Plaintiff intends to use these alleged facts to anchor the amounts for overtime wages

22

due and Labor Code penalties.

23

The Court will assume arguendo that allegations regarding service charge distributions

24

---

25

[10] Plaintiffs cite: *Schwarzer, Tashima & Wagstaffe,* RUTTER GROUP PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2015), p. 2D-215, ¶2:3755 citing *Bankhead v. American Suzuki MotorCorp., 529 F. Supp. 2d 1329, 1334 (M.D. Ala. 2008).*

26

27

[11] As opposed to:  "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."  28 U.S.C. § 1447(c).

28

1   should be considered in ruling on Plaintiffs' motion, on a theory that these allegations clarify

2   rather than alter Plaintiffs' claims.  *See Abrego Abrego v. The Dow Chem. Co.,* 443 F.3d 676,

3   690–91 (9th Cir. 2006) ("it is clearly appropriate for the district courts, in their discretion, to

4   accept certain post-removal admissions as determinative of the amount in controversy"); 14C

5   Fed. Prac. & Proc. Juris. § 3725.2 (4th ed.).  Further, apart from these allegations, Plaintiffs attach

6   a March 30, 2015, letter sent to the California labor and Workforce Development Agency and

7   Defendant (apparently the PAGA letter referenced, *supra*), which states that Plaintiff was payed a

8   "base hourly rate in addition to other compensation."  (ECF No. 9-2 at 27.)  The letter references

9   Labor Code § 200, which defines wages as "all amounts for performed by employees of every

10  description, whether the amount is fixed or ascertained by the standard of time, task, piece,

11  commission basis or other method of calculation."  Thus, at the time of removal in April, 2015, it

12  is a reasonable position that Defendant knew the Complaint was based upon wage payment

13  violations that included service charge distributions, i.e. "other compensation" or "other

14  method[s] of calculation."

15       However, Plaintiffs' Motion to Remand also relies on the allegations that the average

16  employee is due $100 in overtime wages, and the average class member worked overtime in

17  approximately 10 pay periods.  The specific calculations offered in Plaintiffs' Motion for

18  overtime payments due and Labor Code § 226(e) penalties use variables respectively of $100 and

19  10 pay periods.  (Rem. Mot. at 9–10.)  These are new allegations, not clarifications, with no

20  evidentiary support.  Accordingly, these allegations are subject to the rule that "post-removal

21  amendments to the pleadings cannot affect whether a case is removable, because the propriety of

22  removal is determined solely on the basis of the pleadings filed in state court."  *Costco Wholesale*

23  *Corp.,* 471 F.3d at 976.  Moreover, "[i]n the event that the plaintiff does contest the defendant's

24  allegations, both sides submit proof and the court decides, by a preponderance of the evidence,

25  whether the amount–in–controversy requirement has been satisfied."  *Owens*, 135 S. Ct. at 550.

26  The only evidence that has been submitted is the sworn declaration and sworn supplemental

27  declaration of Centerplate employee Mr. Winarski.  Plaintiffs do not share with the Court what

28  "current information," FAC ¶¶ 26 and 62, leads them to allege that the average overtime payment

15

1    owed is $100, or that the average class member worked overtime in 10 pay periods.  In *Bankhead*,

2    for example, the additional information considered by the court included settlement demand

3    letters, requesting specific amounts of money.

4          Plaintiffs dispute the accuracy of the numbers stated in Mr. Winarski's sworn

5    declarations, but offer no evidence that contravenes these numbers.[12]  An affidavit showing that

6    potential damages exceed the jurisdictional amount may satisfy Defendant's burden.  *Lewis v.*

7    *Verizon Commc'ns, Inc.*, 627 F.3d 395, 397 (9th Cir. 2010); *Ibarra v. Manheim Investments, Inc.*

8    775 F.3d 1193, 1197 (9th Cir. 2015) (citing *Singer v. State Farm Mut. Auto Ins. Co.,* 116 F.3d

9    373, 377 (9th Cir. 1997) ("The parties may submit evidence outside the complaint, including

10   affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in

11   controversy at the time of removal'").  Based on the figures in those declarations, Defendant

12   calculates the amount in controversy to be several times greater than the $5 million requirement,

13   in both their Notice of Removal and Opposition to the Motion to Remand.  The Court finds that

14   both parties are engaging in some speculation and engineering of damages amounts.[13]  The main

15   point to draw from the foregoing is that there are a number of different ways to calculate the

16   amount in controversy, owing to the vague or non-existent allegations in the Complaint and FAC

17   regarding the hours worked, number of employees, and/or service charge distributions.  Further,

18   there is no evidence submitted by Plaintiffs to contradict Mr. Winarski's declaration and

19   Defendant's corresponding calculations.  Some of Plaintiffs' challenges, regarding whether the

20   amount in controversy can be met, are not just based on new allegations in the FAC.  For

21   example: the factor for calculating overtime wages due should be .5 rather than 1.5; the period of

22   liability for some claims should be 3 years instead of 4; and that § 226(e) penalties should not

23   include the $100 "second penalty" because Defendant was never aware it had committed a first

---

24   [12] Plaintiffs have submitted example pay stubs of David Foster, as attachments to their Opposition to Defendant's
25   Motion to Transfer Venue.  (ECF No. 12-2, Ex. 1.)  However, neither Plaintiffs' Remand Motion nor Reply reference
     these pay stubs, or provide analysis of what they show relative to the amount in controversy.

26   [13] In particular, what service charges should be included in Plaintiffs' rate of pay are not pled with any specificity in
27   the Complaint or FAC, and are not within the Winarski declarations.  While it is Defendant's burden to show that
     removal is proper, it is Plaintiffs who allege that service charges must contribute to putting the amount at $5 million
28   or below.  Plaintiffs offer no specificity regarding these service charges, other than new allegations in the FAC,
     which would contradict the calculations put forth by Defendant.  (Def.'s Opp.'n at 9–10).

violation.  However, overall, Plaintiff's Motion to Remand relies heavily on the unsupported new

allegations in the FAC.  Defendant is the only party that submitted any evidence (albeit minimal),

and based on that evidence has shown by a preponderance that the amount in controversy is

above $5 million (albeit neither party puts forth a single, coherent way of calculating that

amount).  Defendant has offered more than a "ministerial determination that the complaint called

for over $5 million," *Ibarra*, 775 F.3d at 1197.  *See also Korn v. Polo Ralph Lauren Corp.*, 536 F.

Supp. 2d 1199, 1205 (E.D. Cal. 2008) ("The ultimate inquiry is what amount is put 'in

controversy' by the plaintiff's complaint, not what a defendant will *actually* owe"); *Brill v.

Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005) ("The question is not what

damages the plaintiff will recover, but what amount is 'in controversy' between the parties").

        For the stated reasons, the Court finds the requirements of 28 U.S.C. § 1332(d) are met,

and therefore Plaintiff's Motion to Remand is DENIED.[14]

### IV.  Motion to Transfer

    A. <u>Legal Standard</u>

        Defendant moves to transfer this action to the Southern District of California.  28 U.S.C. §

1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a

district court may transfer any civil action to any other district or division where it might have

been brought or to any district or division to which all parties have consented."  "[T]he burden is

on the defendant seeking transfer under section 1404(a) to establish why there should be a change

---

[14] Because the Court finds federal jurisdiction is present under CAFA, which is the main issue raised in the parties' briefing, the Court need not reach whether jurisdiction is also present under the National Labor Relations Act ("NLRA").  Defendant argues that NLRA jurisdiction is present because "[e]mployees' class and collective actions are protected concerted activity in that they seek to initiate concerted activity for mutual aid or protection."  (ECF No. 1 ¶ 33.)  Defendant further argues: "this purported class action implicates issues *arguably* governed by Section 7 of the NLRA, 29 U.S.C. § 157 … [and] Section 9(a) of the NLRA, 29 U.S.C. § 159(a)."  (ECF No. 14 at 10.)  *See* 29 U.S.C. § 157 (protecting employees' "right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection…"); 29 U.S.C. § 159(a) (providing that the National Labor Relations Board has exclusive jurisdiction over the selection of representatives "designated or selected for the purposes of collective bargaining").  *See Bassette v. Stone Container Corp*, 25 F.3d 757, 759 (9th Cir. 1994) (the NLRA "prevents states from regulating any conduct subject to the regulatory jurisdiction of the National Labor Relations Board" and "prevents a state from interfering with conduct in the labor-management sphere that Congress intended to be unregulated by either state or federal law").  Plaintiff points out in response that Defendant does not cite any case holding that a California wage and hour class action brought exclusively under state law, which is the case here, must confer federal question jurisdiction under the NLRA.  In any event, because jurisdiction is present under CAFA, the Court declines to give further analysis of this issue.

1    of forum." *Allstar Marketing Group, LLC v. Your Store Online, LLC,* 666 F. Supp. 2d 1109,

2    1131 (C.D. Cal. 2009) (citing Wright et al., Fed. Prac. & Proc. § 3848).  Plaintiffs do not dispute

3    that this action originally "might have been brought" in the Southern District.  Therefore, the

4    Court turns to the parties' other arguments regarding transfer under § 1404(a).

5            "A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors

6    in its determination whether transfer is appropriate in a particular case.  For example, the court

7    may consider: (1) the location where the relevant agreements were negotiated and executed, (2)

8    the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the

9    respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of

10   action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the

11   availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8)

12   the ease of access to sources of proof." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99

13   (9th Cir. 2000).  An additional factor to be considered is "the relative court congestion in the two

14   forums." *Davis v. Social Service Coordinators, Inc.,* 2013 WL 4483067, at *2 (E.D. Cal. Aug.

15   19, 2103).  The parties raise additional issues not mentioned specifically within this recitation of

16   factors which the Court will address.

17          B.  Choice of Forum; Location of Parties, Witnesses, and Evidence; Class Action

18              Considerations

19          "In this circuit, a plaintiff's choice of forum is generally granted great weight[.]" *DeFazio*

20   *v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1089 (E.D. Cal. 2005)

21   (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)); *see Atlantic Marine Const. Co., Inc.*

22   *v. U.S. Dist. Court for the Western Dist. of Texas*, 134 S. Ct. 568, 581–82 (2013) (choice of venue

23   deserves deference).  However, that deference is lessened where plaintiff's residence is not in the

24   chosen forum.  *Belzberg*, 834 F.2d at 739 (citations omitted) ("Although great weight is generally

25   accorded plaintiff's choice of forum, [] when an individual brings a derivative suit or represents a

26   class, the named plaintiff's choice of forum is given less weight"); *Fabus Corp. v. Asiana Exp.*

27   *Corp.*, 2001 WL 253185, at *1 (N.D. Cal. Mar. 5, 2001) ("the degree to which courts defer to the

28   plaintiff's chosen venue is substantially reduced where the plaintiff's venue choice is not its

18

1    residence or where the forum chosen lacks a significant connection to the activities alleged in the

2    complaint"); *Cook v. Hartford*, 2012 WL 2921198, at *2 (E.D. Cal. July 17, 2012).  Here, it is not

3    disputed that both named Plaintiffs were residents within the Southern District during the period

4    of the alleged violations, and at the time of filing of the Complaint and the instant Motion to

5    Transfer, they were residents within said district.[15]

6           Plaintiffs argue that their residence is irrelevant because this is a class action, and thus the

7    focus should be on the location of the majority of class members.  On this point, Plaintiffs

8    reference *Georgouses v. NaTec Res., Inc.*, 963 F. Supp. 728, 730 (N.D. Ill. 1997) ("because

9    plaintiff alleges a class action, plaintiff's home forum is irrelevant"); *Genden v. Merrill Lynch,*

10   *Pierce, Fenner & Smith, Inc.*, 621 F. Supp. 780, 782 (N.D. Ill. 1985) ("[w]here, as here, the class

11   is nationwide and has no unique local interest or contact with the transferring district, the

12   deference usually accorded by courts to the plaintiff's choice of venue is less important").

13   Plaintiffs point out they have alleged a putative class consisting of all of Centerplate's non-

14   exempt employees within California, and that Centerplate has employees throughout California,

15   including a significant number within Sacramento County.  (Pl.'s Opp.'n at 6.)  Defendant does

16   not point to evidence that would contravene these allegations, but argues that "where, as here, a

17   plaintiff brings a statewide putative class action based on employment law violations alleged to

18   have occurred in another district, non-party witnesses are more likely to reside in the district

19   where the alleged misconduct transpired and that this factor tips in favor of transferring venue."

20   *Arreola v. Finish Line*, 2014 WL 6982571, at *10 (N.D. Cal. Dec. 9, 2014).  Defendant also

21   argues that because the class has not yet been certified, the Eastern District does not yet have ties

22   to this case by virtue of class members working and/or residing within this District.  Thus, only

23   allegations relevant to the named Plaintiffs, for whom all relevant acts occurred in the Southern

24   District, are at issue thus far.  (Mot. Transf. at 9.)  Courts have considered the potential testimony

25   of non-named class members to be too speculative to factor into the transfer analysis.  *See Wilson*

26   *v. Walgreen Co.* 2011 WL 4345079, at *4 (N.D. Cal. Sept. 14 2011) (collecting cases).

27          Turning more specifically to potential witnesses, Plaintiffs argue that Defendants rely

28   _____
     [15] Plaintiff David Foster states he planned to moved to Las Vegas in mid-July, 2015.  (ECF No. 12-2 at 2.)

1  upon generalizations regarding witnesses, and that Defendants have not identified key witnesses

2  or presented some statement of what their testimony would include.  *See Steelcase, Inc. v.*

3  *Haworth, Inc.*, 1996 WL 806026, at *3 (C.D. Cal. May 15, 1996) ("To demonstrate

4  inconvenience the movant should produce information regarding the identity and location of the

5  witnesses, the content of their testimony, and why such testimony is relevant to the action").

6  However, Defendants have set forth enough to show that key witnesses would be located in the

7  Southern District as opposed to being located in the instant Eastern District.  Plaintiffs do not

8  dispute Defendant's statements that during the entire time Plaintiffs worked for Centerplate, they

9  worked at Centerplate's locations in San Diego, including Qualcomm Stadium and the San Diego

10  Convention Center, but in no location outside of San Diego County.  Thus, coworkers or

11  supervisors would be located there, rather than this District.  It is reasonable that those witnesses

12  would testify to Centerplate's wage policies and practices, work schedules of Plaintiffs and other

13  class members that worked with Plaintiffs, instructions given, wage rates paid, etc.  (Mot. Trans.

14  at 7.)  Class members in this District could potentially testify, but the named Plaintiffs were at all

15  relevant times located in the Southern District.

16        Plaintiffs also argue that other relevant persons or entities within Centerplate are located

17  outside of the Southern District, which speaks to which witnesses might offer testimony and

18  which other evidence might be presented.  Plaintiffs submit that payroll calculations are

19  conducted either outside of California or in a centralized California location outside of the

20  Southern District.  Printouts of Plaintiff David Foster's paystubs show the checks being issued by

21  a Centerplate Office in Greenville, South Carolina.  (Foster Decl., ECF No. 12-2, Ex. 1.)

22  Centerplate's business entity filing with the California Secretary of State identifies the same

23  Greenville, South Carolina company address.  Centerplate's California Agent for Service of

24  Process is located in Sacramento.  Centerplate's "world headquarters" is apparently in Stamford,

25  Connecticut.  Thus, Plaintiffs argue that none of these locations would indicate key witnesses or

26  evidence are located in the Southern District.  However, based on Plaintiffs' representations,

27  except for Defendant's Agent for Service of Process, none of these persons or entities are located

28  in this District or the Southern District.  The Court does not find any apparent relevance of the

1    location of Defendant's Agent for Service of Process, for this transfer motion under § 1404(a).

2    Therefore, none of these stated locations weigh either in favor of transfer or retaining this matter

3    in this District.

4         Based on the foregoing, and considering the default rule that a plaintiff chooses the forum,

5    coupled with the fact that this is a potential statewide class action involving wage violations

6    occurring both in this District and in the Southern District, the facts appear to weigh against

7    transfer.  However, the presumption in favor of Plaintiffs' chosen forum is mitigated in this case.

8    The fact that the class has not yet been certified, the fact that potential witnesses specific to

9    Plaintiffs (coworkers and supervisors) likely reside in the Southern District, the fact that Plaintiffs

10   were residents of the Southern District at the time this suit was filed and have no other connection

11   to this District, and the fact that most or all relevant conduct specific to Plaintiffs occurred in the

12   Southern District, weigh in favor of transfer.  On balance, the Court finds these interrelated

13   factors weigh in favor of transfer.

14        C.   Location of Counsel; Costs and Delay; Prior Litigation; Congestion of the Districts;

15             Forum Shopping

16        Defendant raises the issue of the location of counsel and points out that counsel for

17   Plaintiffs have offices in the Southern District.  It appears that counsel for both parties have

18   offices in the Southern District, but Plaintiffs additionally submit that "their counsel are

19   comprised of both Southern District and Eastern District attorneys."  (Pl.'s Opp.'n at 6.)

20   Regardless, the location of counsel is generally not a factor in the transfer analysis.  *See DeFazio*,

21   406 F. Supp. 2d at 1090 ("courts have not considered the location of the parties' counsel as a

22   factor for transfer"); *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183,

23   1195 (S.D. Cal. 2007) ("the convenience of counsel is irrelevant").  Therefore, the Court finds

24   this factor to be neutral.

25        To the extent the location of counsel implicates the costs of litigation, the parties do not

26   raise this issue.  Defendant does point out that other than Defendant's Motion to Dismiss pending

27   before this Court, discovery is on hold pending the parties' Rule 26(f) conference.  Therefore,

28   Defendant submits that the transfer of venue will not cause any undue delay in the proceedings

1  nor any increase in or duplication of the expenses of the litigation. Plaintiffs do not dispute this

2  characterization. Therefore, the Court finds issues relative to delay and the costs of litigation to

3  be neutral.

4  Defendant submits that both Plaintiffs submitted claims as part of the settlement in a

5  recently concluded class action in the Southern District, which involved overlapping claims with

6  those here, *Williams v. Centerplate,* No. 3:11-cv-02159-H-KSC. Plaintiffs received and cashed

7  settlement payments from that case. (Mot. Transf. at 4.) Defendant thus argues there is a

8  compelling basis for transfer, because the Court may have to determine whether and to what

9  extent prior orders in the *Williams* case impact the claims brought by Plaintiffs in the instant case.

10 Plaintiffs do not dispute that they were part of the settlement in *Williams*, but argue it has no

11 relevance to the instant motion. Defendant does not cite authority for the position that a suit

12 which has concluded, though involving potentially overlapping claims, favors transfer of the

13 related pending case to the District in which the prior suit was litigated. It appears this Court

14 could consider the *Williams* rulings just as the Southern District could. Therefore, the Court finds

15 this factor is neutral.

16 Defendants submit that the median time from filing to disposition, or from filing to trial, is

17 slightly faster in the Southern District than the Eastern District.[16] Generally, that assessment is

18 correct. Therefore, the relative congestion of the two forums weighs slightly in favor of transfer.

19 Finally, Defendants' position that Plaintiffs are engaged in forum shopping has some

20 support. Most or all of the relevant conduct for the named Plaintiffs occurred in the Southern

21 District, where Plaintiffs also resided when this action was filed. Plaintiffs do not provide an

22 explanation for why this matter was not simply brought in the Southern District. "Circumstances

23 in which a plaintiff's chosen forum will be accorded little deference include cases of anticipatory

24 suits and forum shopping." *Royal Queentex Enterprises v. Sara Lee Corp.*, 2000 WL 246599, at

25 *3 (N.D. Cal. Mar. 1, 2000) (citing *Mission Ins. Co. v. Purina Fashions Corp.,* 706 F.2d 599, 602

---

26 [16] The Court takes judicial notice of the fact that the Eastern District generally has a higher case load than the
27 Southern District. Defendants submit specifically that, per statistics located at www.uscourts.gov/Statistics.aspx (for
   the June 30, 2014 reporting period), the median time from filing to disposition and filing to trial in the Eastern
   District of California was 8.4 months and 33.8 months, compared to 6.8 months and 31.1 months in the Southern
28 District.

1  n. 3 (5th Cir. 1983)).  Therefore, what deference is afforded to Plaintiffs for their choice of forum

2  is mitigated due to forum shopping.

3       Based on the foregoing, relative to § 1404(a)'s mandate that the Court consider the

4  convenience of the parties and witnesses, and the interest of justice, the Court finds Defendant has

5  met its burden to show transfer is warranted.  The only factors weighing in favor of retaining this

6  matter are the default rule that a plaintiff may bring an action in the forum of his choosing, and

7  that potential class members reside in this District.  However, for the reasons discussed, *supra*,

8  the presumption in favor of Plaintiffs' chosen forum is mitigated in this case.  Although

9  Defendant does not put forth a persuasive argument that a class will not be certified, or that

10  potential members do not reside in this District, the named Plaintiffs – the most obvious

11  candidates for participation in this lawsuit – at all relevant times worked in the Southern District

12  and resided there.  All of the additional issues discussed, *supra*, were either neutral or weighed in

13  favor of transfer.  Therefore, Defendant's Motion to Transfer Venue is GRANTED.

14       **V.  Motions to Dismiss and/or Strike**

15       In light of the foregoing, the Court does not rule on the pending Motion to Dismiss and/or

16  Strike the FAC (ECF No. 11), as it is more appropriately decided by the transferee court.  *See*

17  *One on One Basketball, Inc. v. Global Payments Direct, Inc.,* 38 F. Supp. 3d 44, 51–52 (D.D.C.

18  2014) (declining to rule on defendant's motion to dismiss after granting motion to transfer);

19  *Ithaca Ventures k.s. v. Nintendo of Am. Inc.*, 2014 WL 4829027, at *8 (D. Del. Sept. 25, 2014)

20  (declining to rule on a motion for sanctions after granting motion to transfer).

21       **VI.  Conclusion**

22       For the stated reasons:

23       •   Plaintiffs' Motion to Remand (ECF No. 9) is DENIED.

24       •   Defendant's Motion to Transfer (ECF No. 6) is GRANTED.  This action is hereby

25          transferred to the U.S. District Court for the Southern District of California.

26       •   The Court does not rule on Defendant's Motions to Dismiss and/or to Strike (ECF No.

27          11).

28       •   The Clerk of the Court shall close the case.

1   Dated: February 22, 2016

2

3

4                                                     Troy L. Nunley
                                                      United States District Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28